Filed 3/4/14  Melchiori Construction Co. v. Hughes CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MELCHIORI CONSTRUCTION COMPANY, INC.,<br><br>    Plaintiff, Respondent,<br>    and Cross-Appellant,<br>v.<br><br>DONALD B. HUGHES,<br><br>    Defendant, Appellant,<br>    and Cross-Respondent | 2d Civil No. B236306<br>(Super. Ct. No. 1305419)<br>(Santa Barbara County)<br>MODIFICATION OF OPINION ON<br>DENIAL OF REHEARING<br>(No Change in Judgment) |

THE COURT:

The opinion filed herein on February 5, 2014, is modified as follows:

Delete the entire paragraph appearing on pages 25 and 26 after the title "*Remand"* and insert the following.

On the cause of action for fraud, the matter must be remanded for a new trial on the issues of compensatory and punitive damages.  As to the issue of compensatory damages, the trier of fact shall be bound by the jury's special verdict findings in the original trial, with the exception of the finding on the amount of damages.  Punitive damages may be awarded only if Company establishes fraud, oppression, or malice by clear and convincing evidence.

The petition for rehearing is denied.

No change in judgment.

Filed 2/5/14  Melchiori Construction v. Hughes CA2/6 (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MELCHIORI CONSTRUCTION COMPANY, INC.,<br><br>　　　　　Plaintiff, Respondent,<br>　　　　　and Cross-Appellant,<br>v.<br><br>DONALD B. HUGHES,<br><br>　　　　　Defendant, Appellant,<br>　　　　　and Cross-Respondent | 2d Civil No. B236306<br>(Super. Ct. No. 1305419)<br>(Santa Barbara County) |

Donald Hughes appeals from the judgment entered in favor of Melchiori Construction Company, Inc., (Company) after a jury trial.  The jury returned a special verdict finding that Hughes had committed promissory fraud and that a codefendant, Chapala One, LLC, (Chapala), had breached its contract with Company.  Chapala has not appealed from the judgment.  The jury awarded Company compensatory damages of $5,819,165 against Hughes and Chapala.  The award was offset by a $3,097,432.71 pretrial settlement, reducing it to $2,721,732.30.  The trial court refused to allow an offset for another pretrial settlement of $2.3 million.

Hughes contends, inter alia, that the evidence is insufficient to support the fraud judgment and that he should have received credit for the $2.3 million settlement.  We conclude that the evidence is sufficient to sustain the fraud judgment.  But the amount

of compensatory damages ($5,819,165) awarded by the jury must be vacated. We also conclude that Hughes is entitled to an offset for the $2.3 million settlement.

Company cross-appeals, contending that the trial court erroneously (1) refused to allow its punitive damages claim to go to the jury, and (2) denied its postjudgment motion to add Hughes personally as a judgment debtor on the breach of contract judgment against Chapala. We conclude that the first contention has merit but that the second does not.

We remand the matter for a new trial solely on the issues of compensatory and punitive damages.

*Facts*[1]

Chapala, a limited liability company, was formed for the sole purpose of developing Chapala One, a mixed-use real estate project in Santa Barbara. "Mixed-use" means that the project has residential and commercial components. Hughes and Bill Levy were the original voting members of Chapala. Hughes's aunt was a nonvoting member. In January or February 2007 Levy withdrew from Chapala, leaving Hughes as the sole voting member. Until his departure, Levy was the managing member and was running the business. After Levy's departure, Hughes became the managing member.

Mark Melchiori was the president of Company, a general building contractor that worked primarily on commercial projects. It typically used subcontractors to

---

[1] The facts are based on the 4,002-page reporter's transcript and the 3,773-page joint appendix. We have not considered exhibits that are not included in the joint appendix. The record shows that 48 boxes of exhibits were released to the parties. Two weeks before oral argument, Hughes applied for permission to lodge 39 exhibits with this court. The exhibits are voluminous. Company filed opposition to the application. We deny the application because (1) it is untimely, (2) Hughes has not shown good cause for the delay, and (3) Hughes has not shown that he will be prejudiced if this court does not consider the exhibits. (See Cal. Rules of Court, rule 8.224(a)-(c), and Advisory Committee Comment to rule 8.224(c).)

perform most of the work.  In October 2004 Company and Chapala signed a contract for the construction of Chapala One.  Company had submitted a bid of $18,369,473.  The contract did not specify a price because the project plans and specifications were incomplete.

In March 2006 Company and Chapala signed a document entitled "Amendment No. 1" to the construction contract.  The amendment established a "Guaranteed Maximum Price for the Work" (GMP) of $26,183,198.  The GMP was based, inter alia, on plans attached to Amendment No. 1.  But the plans were still incomplete.

The GMP could be changed by either of two procedures.  One procedure is called a "Potential Change Order" (PCO).  The other procedure is called a "Construction Change Directive" (CCD).  The PCO procedure is much slower than the CCD procedure.  Under the PCO procedure, the general contractor obtains specifications and drawings for the change from an architect.  It then asks subcontractors to submit bids.  The general contractor analyzes the bids, submits them "to ownership and wait[s] for [its] approval to execute the work."  Both the general contractor and the owner must sign the PCO for it to be effective.

The CCD procedure permits the owner to demand that a change be made immediately without the general contractor's agreement and without obtaining bids from subcontractors.  Trent Lyon, Company's expert on construction contracts, testified: "[A] CCD . . . is a directive from the owner prepared by the architect and signed by both that tells the contractor, 'Make this change.  We're in a big hurry.' "  By issuing a CCD, "the owner can mandate that the contractor has to proceed even under protest even though the pricing's not resolved."

Lyon believed that all of the CCDs were payable based on time and material.  He opined that Company would have breached the construction contract if it had stopped CCD work because of nonpayment for that work.  On the other hand, Company was entitled to stop work required by the base contract, which included PCO work, because of nonpayment.

3

During his testimony, Hughes confirmed Lyon's opinion that Company did not have the right to stop CCD work for nonpayment. Hughes was asked: "And you know that if [Chapala] pays the base contract work in full, or nearly in full, there's nothing [Company] can do except beg and plead for the CCD money that it believes is due and owing. In other words, it just can't walk off the job. You know that from the contract." Hughes replied, "That was my understanding."

Chapala initially used the PCO procedure for change orders but later switched to the CCD procedure. Chapala issued 16 or 17 PCOs, which authorized approximately $3 million in change orders.

Chapala issued its first CCD in April 2007, two to three months after Levy had withdrawn from the Company. In July 2007 Chris Raftery began working for Chapala as a full-time consultant. Through September 2007, about 22 CCDs were issued. During this period, "[p]ayment was late and short" for the CCD work. On September 20, 2007, $300,000 to $400,000 was owed for CCD work.

Despite its nonpayment for CCD work, Chapala continued to issue CCDs requiring Company to make additional changes. Through the completion of the project, Chapala issued 84 CCDs for which Company billed about $4.7 million. The project was completed between October 30, 2008 and December 1, 2008. On the latter date, a certificate of occupancy was issued.

"[T]he bank," i.e., Washington Capital Management and other construction lenders, hereafter collectively referred to as "the lenders," informed Hughes "many times" that Chapala was "out of balance with the loan."[2] A loan is out of balance when the available funds are insufficient to complete the project. But Hughes kept increasing the project's cost by issuing CCDs. Hughes did not inform Company of Chapala's financial difficulties.

---

[2] The complaint alleged that the construction lenders were CLPL, Inc., and Chapala Investments. Washington Capital Management, Inc., "served as the agent of [CLPL, Inc., and Chapala Investments]."

4

Company's total bill for the project was $34,752,000. It received Chapala's last payment on October 29, 2008. William Jones, Company's expert on construction accounting, testified that "the total amount outstanding as billed under the contract" was $5,891,307.06." But Mark Melchiori, Company's President, testified that Chapala owed Company "[r]oughly $6.8 million."

*Company's Complaint*

The operative pleading, Company's second amended complaint, alleged thirteen causes of action. The causes of action relevant to this appeal are the first against Chapala for breach of contract, the eighth against Chapala and Hughes for fraud, and the tenth against the lenders for fraud. Pursuant to a pretrial settlement, the tenth cause of action was dismissed upon the lenders' payment of $2.3 million to Company (lenders' settlement).

*Verdict and Judgment*

The jury was asked to return a special verdict on only the first cause of action (breach of contract) as to Chapala and the eighth cause of action (fraud) as to Hughes. It found that Chapala had breached its contract with Company and that Hughes had committed promissory fraud. The jury determined that Company's total damages were $5,819,165. The special verdict form did not ask the jury to apportion damages between the fraud and breach of contract claims.

The trial court's judgment notes that Company "concedes that it has been paid $3,097,432.71 by the project lenders in settlement of certain subcontractor claims" (subcontractors' settlement). The court applied the subcontractors' settlement against the jury's damages award of $5,819,165, reducing it to $2,721,732.30. The court did not allow a credit for the additional $2.3 million lenders' settlement. The court ordered that "[j]udgment shall be entered in favor of [Company] and against Chapala One LLC and Donald Hughes individually in the amount of $2,721,732.30 for breach of contract and fraud and costs of suit in the amount of $94,467.39." It further ordered that judgment be entered solely against Chapala "for the sum of $4,426,156.79

5

representing prompt payment penalties due pursuant to Civil Code section 3260 and 3260.1."  The court awarded Company its attorney fees of $1,663,250, payable solely by Chapala.

## HUGHES'S APPEAL

### *Sufficiency of the Evidence: Standard of Review*

Hughes contends that the evidence is insufficient to support the judgment in Company's favor on the cause of action for fraud.  " 'It is the duty of an appellant who claims insufficiency of the evidence . . . "to demonstrate that there is no substantial evidence to support the challenged findings" [citation].' "  (*In re Edwards' Estate* (1959) 173 Cal.App.2d 705, 711, 344 P.2d 89.)  "[U]nder the substantial evidence test, the court views the evidence in a light most favorable to the respondent."  (*Orange County Employees Assn. v. County of Orange* (1988) 205 Cal.App.3d 1289, 1293.)  "[A]ll conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. . . . [T]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury."  (*Crawford v. Southern Pac. Co.* (1935) 3 Cal.2d 427, 429.)  " 'Substantial evidence' is 'evidence "*of ponderable, legal significance, . . . reasonable in nature, credible, and of solid value.*" '  [Citation.]"  (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1243.)

### *Sufficiency of the Evidence: Promissory Fraud*

The fraud cause of action was based on Hughes's allegedly fraudulent promises to pay for CCD work.  In respondent's brief Company states: "The factual basis for the allegations of fraud was the implementation of the CCD process for making changes to the contract."  Unlike base contract work, Company was contractually required to proceed with CCD work even though it was not receiving payment for that work.  During closing argument, Company's counsel stated: "They're paying [Company] some small amount of the past due money on the base contract amount.  Remember,

6

the base contract amounts are the PCO and the base scope of work where [Company] . . . can walk off the job for nonpayment.  [¶]  So this is a very deliberate, very clever and very fraudulent scheme to defraud [Company] *only* of that money, *only* of that money wherein [Company] can't walk off the job [for nonpayment, i.e., the CCD work].  [Company has] got to finish it one way or the other."  (Italics added.)  "The reality is they went to the CCD process ultimately because they could force [Company] to do the work [without payment], and it had the side benefit of being faster."  "[E]very time Don Hughes is signing one of these CCDs or causing one of them to be signed it's like writing a check. . . . [Y]ou have to be able to pay for that, have the present ability to pay for that work . . . because that work's about to begin . . . ."  "[Hughes] just keep[s] writing commands to [Company], CCD, go work, man up the job . . . .  We'll pay you . . . ."  "They either do the [CCD] work and don't get paid or don't do the work and they get on the hook for delay.  Exactly what Don Hughes knew. . . . He knew he had them over a barrel."

"The elements of promissory fraud . . . are: (1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promisee.  [Citation.]"  (*Behnke v. State Farm General Ins. Co.* (2011) 196 Cal.App.4th 1443, 1453.)

Hughes does not challenge the sufficiency of the evidence to show that he promised to pay for each of the 84 CCDs.  Nor does he challenge the sufficiency of the evidence to show that he did not perform as promised.  Hughes contends that the evidence is insufficient to show (1) that he did not intend to perform the promises to pay for CCD work when he made them, (2) that Company reasonably relied on the promises, and (3) that there was a causal connection between his failure to perform and the jury's damages award of $5,819,165.  Only the third contention has merit.

7

Substantial evidence supports the jury's finding that Hughes did not intend to perform his promises to pay for CCD work when he made them. It is reasonable to infer that Hughes knew Chapala would be unable to pay for the work. The lenders informed Hughes "many times" that Chapala was "out of balance with the loan." According to Chris Raftery, Chapala's full-time consultant, at one point "there was an imbalance of between eight and $13 million." Eloise Hardy, an employee of Chapala, testified that "the bank" had told Hughes, " 'Stop making changes,' " and that "the changes he was making he had to pay for himself." But Hughes continued to issue CCDs requiring Company to make changes to the project. On March 19, 2008, staff at Washington Capital wrote an email to Raftery asking, "Does [Company] realize that they will not be getting paid for these charges in relation to CCD work?"[3]

Moreover, Hughes told Scott Jacobs, Company's lead project manager for the Chapala One project, that "he wanted to drive that GD [goddamned] blank [i.e., Mark Melchiori, Company's president] out of business." In his testimony Jacobs used the term "blank" because the trial court had previously ruled that the ethnic slur allegedly used by Hughes - "wop" - was inadmissible.[4] The only way that Hughes could drive Melchiori out of business was by not paying Company. Hughes argues that "Jacobs' testimony is incredulous since Hughes would derive no possible benefit from ruining the general contractor he had just hired to construct the condominiums he ultimately hoped to sell." "A reviewing court cannot reject the testimony of a witness that has been believed by the trier of fact unless there exists either a physical impossibility that it is true or its falsity is apparent without resorting to inferences or deductions." (*Maurice L. Bein, Inc. v. Housing Authority of City of Los Angeles* (1958) 157

---

[3] Hughes asserts that "this email referred to approximately $250,000 in charges . . . ."

[4] We do not consider whether the trial court erroneously excluded the highly probative, but prejudicial, "wop" language. Neither party has raised this issue. On remand, the trial court is not bound by its prior ruling on this issue.

Cal.App.2d 670, 681.) "No such impossibility or falsity exists here . . . ." (*People v. Abner* (1962) 209 Cal.App.2d 484, 491.)

We reject Hughes's argument that his partial payment for some of the CCD work "negates a finding of lack of intent to perform." Hughes does not indicate the extent of the partial payment. The jury could have reasonably found that Hughes partially paid for some of the CCD work to "string Company along" and deceive it into believing that full payment would be forthcoming.

Substantial evidence also supports the jury's finding that Company reasonably relied on Hughes's promises to pay for CCD work. " 'Actual reliance occurs when a misrepresentation is " 'an immediate cause of [a plaintiff's] conduct, which alters his legal relations," ' and when, absent such representation, " 'he would not, in all reasonable probability, have entered into the contract or other transaction.' " [Citations.]' " (*Conroy v. Regents of University of Cal.* (2009) 45 Cal.4th 1244, 1256.) Hughes maintains that the evidence of reliance is insufficient because Company "had a *contractual* mandate to commence work when it received an executed CCD." Hughes asserts: "[P]erformance of an act one is contractually required to perform, as a matter of law, cannot constitute the reliance necessary to prove fraud."

The jury could have reasonably concluded that Company was not contractually required to perform CCD work for which Hughes refused to pay. Company presented evidence that it could not stop CCD work because Hughes was late in paying for the work. It did not present evidence that Company was required to perform CCD work for which Hughes refused to pay. Hughes and Chapala's agents repeatedly assured Company that it would be paid for CCD work. No one informed Company that it would not be paid.

We now consider Hughes's third contention that the evidence is insufficient to show a causal connection between the failure to perform his promises to pay for CCD work and the jury's damages award. "[T]he damages suffered must be referable to, and caused by, the fraud. [Citation.]" (*Conrad v. Bank of America* (1996) 45

9

Cal.App.4th 133, 159.) The jury awarded the same amount - $5,819,165 - for the breach of contract cause of action against Chapala and the fraud cause of action against Hughes. The jury did not apportion damages between the two causes of action because the special verdict form required a lump sum award for both. Question 17 on the special verdict form asked, "What is the total amount of [Company's] damages?" The jury responded, "$5,819,165."

Damages for the fraud cause of action could not have been $5,819,165. The cause of action was based on nonpayment for CCD work. The total amount billed for this work was about $4.7 million. Company does not dispute Hughes's contention that Chapala partially paid for some of the CCD work. Neither party specifies the amount of the partial payment, but it must have reduced the balance due to below the $4.7 million billed amount. Damages on the fraud cause of action could not have exceeded the balance due for CCD work. We therefore agree with Hughes that "a causal disconnect exists between the limited evidence [Company] introduced and the grand total of damages [$5,819,165] that were attributed to fraud." Accordingly, the damages award must be reversed.

*Hughes Is Entitled to an Offset for the $2.3 Million Lenders' Settlement*

Hughes argues that the trial court erroneously refused to allow an offset for the $2.3 million pretrial settlement that Company received from the lenders. The pertinent statute is Code of Civil Procedure section 877, subdivision (a).[5] It provides: "Where a release . . . is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort," the release "shall not discharge any other such party from liability . . . , but it shall reduce the claims against the others in the amount stipulated by the release . . . ." "[T]he idea of a 'double recovery' is inextricably linked to the joint liability of multiple tortfeasors. When multiple defendants are responsible for the same compensatory damages, a setoff is not only mandated under section 877(a), but is required by the fundamental principle

_____

[5] Unless otherwise stated, all statutory references are to the Code of Civil Procedure.

that . . . 'a plaintiff may not recover in excess of the amount of damages which will fully compensate him for his injury.  [Citations.]'  [Citation.]"  (*Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 67; see also *Reed v. Wilson* (1999) 73 Cal.App.4th 439, 444 ["the offset provided for in section 877 assures that a plaintiff will not be enriched unjustly by a double recovery, collecting part of his total claim from one joint tortfeasor and all of his claim from another".]

"We generally review a ruling granting or denying a section 877 settlement credit under the deferential abuse of discretion standard.  [Citation.]  To the extent that we must decide whether the trial court's ruling was consistent with statutory requirements, we apply the independent standard of review.  [Citation.]"  (*Wade v. Schrader* (2008) 168 Cal.App.4th 1039, 1044.)  In his opening brief Hughes contends that the proper standard of review is abuse of discretion.  But in his reply brief Hughes argues that the proper standard is independent review.  We need not determine which standard of review applies.  Under either standard, the trial court erred in refusing to allow an offset for the $2.3 million settlement.

The tenth cause of action for fraud against the lenders makes clear that they and Hughes "were claimed to be liable for the same tort" of promissory fraud.  (§ 877, subd. (a).)  The complaint alleges that the lenders "participated in a scheme with the intention of enticing [Company] and its subcontractors to improve the property without paying for the work."  The lenders required Chapala to retain the services of Chris Raftery, who "served as the Lenders' inside man" and "communicated directly and often with the president of Washington Capital."  "Mr. Raftery, acting as the lenders' agent, assisted in and directed requests for additional work for which he knew the owner and lenders could not or would not pay."  On October 5, 2007, Raftery "affirmatively represented to [Company] that Washington Capital would pay [Company] directly for the next round of CCDs."  Because of Raftery's "representations on behalf of the lenders, and the promise of forthcoming payment, [Company] remained on the Project and did not elect to terminate the Contract as a

11

consequence of non-payment." "[B]y mid-December 2007 . . . Hughes and Raftery continued to ask [Company] and its subcontractors to perform additional work . . . despite the fact that Mr. Raftery . . . and the lenders had no intention of paying the overdue billed amounts . . . ." The lenders goal was "to take ownership of the Project through the foreclosure process, pushing out both Chapala . . . and any contractor with lien rights, keeping the balance of any construction funds they could withhold in the account for themselves." "Lenders made false promises, representing time and again that payment would be forthcoming so as to persuade the contractors to continue to diligently prosecute the work of improvement; however, lenders had no such intention of making any payments, and intended to defraud [Company] and its subcontractors out of sums due by foreclosing upon the property and wiping out their collective lien rights. [Company] would not have continued prosecuting the work, and performing the numerous changes ordered by way of CCDs had [Company] known the true facts."

According to the complaint, the lenders defrauded Company by knowingly making false promises that it would be paid for CCD work. The theory of Company's action against Hughes was that he had defrauded it in the same manner. The pretrial settlement agreement between Company and the lenders states that the settlement amount of $2.3 million shall "settle disputed claims" between Company and the lenders, including the "fraud" claim. Since the fraud claims against Hughes and the lenders are essentially the same tort, i.e., fraudulent promises to pay for CCD work, Company would obtain a double recovery if Hughes were denied credit for the $2.3 million lenders' settlement.

Company has not cited any facts showing that the offset should be less than the full amount of the settlement. The settlement agreement made no allocation of the $2.3 million between the fraud claim and other "disputed claims." "Where there is a complete dismissal of a defendant [here the lenders], and a plaintiff seeks an allocation of the settlement with that defendant for purposes of limiting the setoff against another defendant's [here Hughes's] liability, the burden is on the plaintiff to establish facts to

12

justify the allocation. [Citation.]" (*Ehret v. Congoleum Corp.* (1999) 73 Cal.App.4th 1308, 1322.)

The lenders' alleged motivation for the fraud - to foreclose on the property to the detriment of both Hughes and Company - is irrelevant. Even though Hughes and the lenders did not act in concert pursuant to a common design, they are joint tortfeasors because they used the same modus operandi - fraudulent promises to pay for CCD work - to cause the same harm to Company. " 'In many cases courts have construed the term "joint tortfeasor," as used in Code of Civil Procedure sections 877 and 877.6, quite broadly to apply not only to "those who act in concert in causing an injury" [citation] but generally to "joint, concurrent and successive tortfeasors" [citations], and even more generally to "all tortfeasors joined in a single action" whose acts or omissions "concurred to produce the sum total of the injuries to the plaintiff." [Citations].' [Citations.] [¶] . . . [¶] 'Joint tortfeasors' have been referred to as 'two or more persons who are liable to the same person for the same harm. It is not necessary that they act in concert or in pursuance of a common design, nor is it necessary that they be joined as defendants.' (Rest.2d Torts, § 886A, com.(1)(b).)" (*Gackstetter v. Frawley* (2006) 135 Cal.App.4th 1257, 1272-1273, fn. omitted; see also *Leko v. Cornerstone Building Inspection Service* (2001) 86 Cal.App.4th 1109, 1115 ["Joint tortfeasors may act in concert or independently of one another"]; *In re JTS Corp.* (9th Cir. 2010) 617 F.3d 1102, 1116-1117 ["Whether individuals are joint tortfeasors under § 877 depends upon whether they caused 'one indivisible injury' or 'the same wrong.' [Citations.] The 'same wrong' may emanate from two successive independent torts and does not require unity of purpose, action, or intent by the two or more tortfeasors."].)

Company argues that section 877 is inapplicable because the trial court did not find that the $2.3 million settlement was made in good faith. Section 877 "governs only good faith settlements." (*Aidan Ming-Ho Leung v. Verdugo Hills Hosp.* (2012) 55 Cal.4th 291, 301.) There is no evidence that Company or the lenders were acting in

13

bad faith when they agreed to the settlement, and the trial court made no finding of bad faith. Even if the trial court had found bad faith, Hughes would still have been entitled to an offset pursuant to the following holding of our Supreme Court: "[W]e hold that when a settlement with a tortfeasor has judicially been determined not to have been made in good faith (see Code Civ. Proc., §§ 877, 877.6, subd. (c)), nonsettling joint tortfeasors remain jointly and severally liable, the amount paid in settlement is credited against any damages awarded against the nonsettling tortfeasors, and the nonsettling tortfeasors are entitled to contribution from the settling tortfeasor for amounts paid in excess of their equitable shares of liability." (*Id*., at p. 308.) This holding was made in the context of a negligence action, but we see no reason not to apply it here.

*The Trial Court Did Not Err in Excluding Evidence of the Settlements*

We reject Hughes's contention that the trial court abused its discretion in excluding evidence of the $3,097,432.71 subcontractors' settlement and the $2.3 million lenders' settlement. Some courts reasonably "take the view that '[t]he presentation of evidence concerning the amount or fact of settlement to the jury . . . is not only confusing, but can also lead to abuse in argument . . . .' [Citation.] For these courts, 'an approved procedure is for the court to reduce the verdict award by the amount paid in settlement before entering judgment on the verdict. [Citations.]' [Citation.]" (*Brawley v. J.C. Interiors, Inc.* (2008) 161 Cal.App.4th 1126, 1133-1134.) The lenders' payment of money to Company in settlement of the lawsuit is irrelevant to the issue of whether Hughes intended to pay for the CCD work when he promised to pay for it.

*Hughes's Special Jury Instruction*

Hughes argues that the trial court erroneously refused to give his proposed special jury instruction on the failure to preserve evidence. The proposed instruction arose from Company's loss of its electronic accounting data after Hughes sought to discover the data. The instruction provided: "If you determine that [Company] intentionally destroyed the data or that [it] failed to take reasonable steps to preserve

14

the data, you should infer that, had the electronic accounting data been produced, its contents would have been unfavorable to [Company]."

We need not consider the merits of Hughes's argument because he has failed to show that the trial court's refusal to give the instruction resulted in a miscarriage of justice. (Cal. Const., Art. 6, § 13.) Hughes alleges: "Since access to electronic data was one of the reasons for withholding payment from [Company] at the end of the project, properly instructing the jury regarding its ability to draw an adverse inference against [Company] would have necessarily affected the determination regarding Hughes' intent to perform." This conclusionary assertion is insufficient to establish a miscarriage of justice. Hughes does not explain why, if the jury had drawn the adverse inference, it is reasonably probable that the jury would have found that Hughes had intended to fulfill his promises to pay for CCD work when he made them. (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

## COMPANY'S CROSS-APPEAL

*Hughes's Request for Judicial Notice and to Take Additional Evidence*

Hughes contends that Company waived its entire cross-appeal because it accepted his payment of the fraud judgment and recorded an acknowledgement of full satisfaction of the judgment. In support of his argument, Hughes requests that we take judicial notice of the following documents: (1) a document filed in the trial court by Hughes on September 29, 2011, and entitled, "Statutory Undertaking to Stay Enforcement of Judgment Pending Appeal"; (2) a document filed in the trial court by Company on October 5, 2011, and entitled, "Notice of Motion and Motion for Order that Undertaking by Judgment Debtor Donald A. Hughes Is Inadequate to Stay Enforcement of Judgment Pending Appeal"; (3) a denied petition for a writ of supersedeas filed by Hughes in this court; (4) an acknowledgement of full satisfaction of judgment signed by Company on November 4, 2011, and recorded in Santa Barbara County on November 9, 2011; and (5) documents filed by Company on October 26,

15

2012, in its chapter 7 proceeding in the United States Bankruptcy Court for the Central District of California. Company filed opposition to the request for judicial notice.

This court may, in its discretion, take judicial notice of the existence of each of the above documents that was filed in a court proceeding, i.e., documents (1), (2), (3), and (5). (Evid. Code, §§ 452, subd. (d), 459; *Kilroy v. State* (2004) 119 Cal.App.4th 140, 145 [" 'courts are free to take judicial notice of the existence of each document in a court file' "].) But we decline to take judicial notice of these documents because they are not pertinent to the waiver issue. On the other hand, we take judicial notice of document (4), the recorded acknowledgement of satisfaction of judgment. (Evid. Code, §§ 452, 459; *Alfaro v. Community Housing Imp. System & Planning Ass'n, Inc.* (2009) 171 Cal.App.4th 1356, 1367, fn. 8.)

Pursuant to section 909 and rule 8.252(c) of the California Rules of Court, Hughes requests that we take additional evidence in the form of an email from his counsel to Company's counsel and the declaration of one of his attorneys, John R. Rydell, II. The email, which was sent on October 25, 2011, purports to "confirm the substance of the agreement for payment of the judgment by Mr. Hughes." Company opposes the request to take additional evidence: "Hughes has not included any response to [the email] or stated that none of the recipients of the e-mail responded to it. Did anyone disagree with [counsel's] 'confirmation' of the parties' agreement? Did everyone agree with it? Did anyone ever respond to it? Hughes leaves the door wide open for an evidentiary dispute." As to Rydell's declaration, Company characterizes it as "a pernicious attempt to argue the merits of Hughes' position on appeal in the guise of a neutral, sworn statement of facts."

" 'Although appellate courts are authorized to [take additional evidence and] make findings of fact on appeal by Code of Civil Procedure section 909 and rule [8.252(b)-(c)] of the California Rules of Court, the authority should be exercised sparingly. [Citation.] Absent exceptional circumstances, no such findings should be made. [Citations.]" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) In view of Company's

16

opposition to the request to take additional evidence, we deny the request with one exception: we find that, in satisfaction of the fraud judgment, Hughes paid Company approximately $2.9 million. Company has not denied that this payment was made.

*Company Has Not Waived Its Cross-Appeal*

In its cross-appeal, Company argues that the trial court erroneously refused to allow its punitive damages claim to go to the jury and erroneously denied its motion to add Hughes personally as a judgment debtor on the breach of contract judgment against Chapala. Company has not waived its cross-appeal by accepting Hughes's payment of the fraud judgment and recording an acknowledgement of satisfaction of judgment. We are aware of "[t]he settled rule that the voluntary acceptance of the benefits of a judgment will bar appeal therefrom [citations] . . . ." (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 744.) The inapplicability of this rule to the instant case is shown by *Templeton Feed and Grain v. Ralston Purina Co.* (1968) 69 Cal.2d 461 (*Templeton*).

In *Templeton* the jury found in favor of the plaintiff and awarded compensatory damages. The trial court granted the defendant's motion for a new trial unless the plaintiff consented to a reduction of the award. The plaintiff consented and the trial court entered judgment accordingly. The defendant appealed from the judgment, and the plaintiff cross-appealed "insofar as the judgment entered reflects the trial court's failure to instruct the jury on exemplary damages." (*Templeton*, *supra*, 69 Cal.2d at p. 463.)

Our Supreme Court held: "Plaintiff's election to accept the trial court's conditional order for a new trial does not bar plaintiff, upon defendant's appeal, from cross-appealing upon the severable issue of plaintiff's claimed exemplary damages." (*Templeton*, *supra*, 69 Cal.2d at p. 468.) The Supreme Court explained: "Although 'ordinarily a party cannot accept the benefits of a judgment, in whole or in part and then attack it by appeal' [citation], a party may take the benefits of the determination of one issue and appeal from another severable part of the judgment. Thus the

17

severability doctrine applies to 'cases wherein the appeal is limited to a specific and severable portion of the judgment under circumstances such that the portion of the judgment appealed from can be reversed without affecting the right of the appellant to retain the fruits which he has theretofore received and retained from the other portions of the judgment not appealed from.' [Citations.] [¶] *A fortiori*, a party does not waive his right to appeal as to a severable issue merely because his consent to the judgment as entered, upon which the alleged waiver rests, has been manifested by his written remittitur rather than by an actual acceptance and enjoyment of the benefits awarded by the judgment." (*Id*., at pp. 468-469, fn. omitted.) The court noted that " '[t]he *issue of exemplary damages* is separate and distinct from that of actual damages, for they are assessed to punish the defendant and not to compensate for any loss suffered by the plaintiff.' " (*Id*., at p. 469.)

Like the plaintiff in *Templeton*, in its cross-appeal Company argues that the trial court erroneously refused to allow its punitive damages claim to go to the jury. The punitive damages issue is a severable portion of the fraud judgment. A reversal on this issue could not affect Company's right to retain benefits received under that judgment. We have decided to reverse, for insufficiency of the evidence, the amount of compensatory damages awarded by the fraud judgment. If, on the other hand, we had upheld the award, it could not be reduced by a new trial on punitive damages.

In its cross-appeal Company also argues that the trial court erroneously denied its motion to add Hughes personally as a judgment debtor on the breach of contract judgment against Chapala. This issue has nothing to do with the fraud judgment. Company, therefore, may proceed with its cross-appeal.

*Guho v. City of San Diego* (1932) 124 Cal.App. 680, is distinguishable. There, the plaintiff accepted payment of the amount of the judgment and filed a satisfaction of judgment. Approximately one month later, he filed a notice of appeal from the judgment. The plaintiff contended that the trial court had erroneously granted the defendant's motion for a directed verdict in plaintiff's favor. The trial court directed

18

the jury to award an amount of damages that was substantially less than the amount plaintiff sought. The appellate court referred to the "general rule" that "a party may not accept the fruits of a judgment and at the same time appeal from the same [citation]." (*Id*., at p. 682.) The court concluded that plaintiff did not fall within an exception to this rule "where the appellant is conceded to be entitled to the thing which he has accepted and where the appeal only relates to an additional claim on his part [citations]." (*Ibid*.)

The *Guho* court continued: "If it be assumed that this appellant had the right to accept the amount paid and thereafter appeal from the judgment, we think he waived his right by accepting such payment upon condition that he satisfy the judgment and by executing and authorizing to be filed, a full and complete satisfaction thereof. . . . '[W]hen a judgment has been satisfied, it has passed beyond review; for the satisfaction thereof is the last act and end of the proceeding'. In our opinion, the acts of this appellant are inconsistent with the retention of a right of appeal. The judgment having been satisfied of record, nothing remained from which to appeal."[6] (*Guho v. City of San Diego*, *supra*, 124 Cal.App. at p. 684.)

Unlike the plaintiff in *Guho*, Company's cross-appeal concerns severable portions of the judgment which, if reversed, could not affect its right to retain benefits received under the judgment. Another distinction is that Company signed and filed the acknowledgement of satisfaction of judgment after it filed its cross-appeal, while the plaintiff in *Guho* signed and filed the acknowledgement before he filed his appeal. The *Guho* court's conclusion about the effect of an acknowledgement of satisfaction of judgment was based on the plaintiff's filing of the acknowledgement before he filed his appeal: "If it be assumed that this appellant had the right to accept the amount paid and

---

[6] In *Heacock v. Ivorette-Texas, Inc.* (1993) 20 Cal.App.4th 1665, 1671, the court considered the above quoted passage to be "dicta." Hughes, on the other hand, argues that "*Guho*'s satisfaction-of-judgment language is not dicta - it's an alternative holding."

19

*thereafter* appeal from the judgment, we think he waived his right . . . ." (*Guho v. City of San Diego*, *supra*, 124 Cal.App. at p. 684, italics added.) Since Company's cross-appeal was pending when it signed and filed the acknowledgement and there is no evidence that it agreed to abandon the cross-appeal, we cannot reasonably infer that Company waived its cross-appeal.[7]

*Alleged Waiver of Argument that the Trial Court*

*Erroneously Refused to Instruct on Punitive Damages*

Before the trial began, Company requested jury instructions on punitive damages. Company argues that the trial court erroneously denied its request. Hughes maintains that Company waived this argument by failing to ensure a proper record. Hughes notes that "the entire discussion of the punitive-damage issue occurred *off the record*." Therefore, Hughes asserts, "the appellate court *must presume there was no instructional error* - for example, that the instruction was withdrawn, abandoned, lost in the shuffle, or [that Company] invited error."

" '[I]t is incumbent upon . . . appellant . . . to make certain that the trial court has ruled [on a requested instruction] and that the record on appeal discloses that ruling before the alleged ruling may be assigned as error. [Citations.]' [Citation.]" (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 678- 679.) The record shows that the trial court refused Company's requested instructions on punitive damages. When the trial court made its tentative ruling denying Hughes's motions for a new trial and judgment notwithstanding the verdict, the court stated: "If I erred it was probably in not permitting the [Company] to produce a punitive damages phase against Mr. Hughes."

---

[7] Although we deny Hughes's request to take additional evidence in the form of an email from his counsel that purports to "confirm the substance of the agreement for payment of the judgment by Mr. Hughes," we note that the email mentions nothing about an agreement by Company to abandon its cross-appeal. The email was sent on October 25, 2011, 20 days after Company filed the cross-appeal. Rydell's declaration also mentions nothing about such an agreement.

*The Trial Court Erroneously Refused to Allow Company's*

*Punitive Damages Claim to Go to the Jury*

The trial court's refusal to instruct on punitive damages " 'essentially amounted to the granting of nonsuit as to the issue of recovery of punitive damages for [the fraud] cause of action. [Citation.]" (*Bell v. Sharp Cabrillo Hospital* (1989) 212 Cal.App.3d 1034, 1043, fn. 10; see also *Hoch v. Allied-Signal, Inc.*, *supra*, 24 Cal.App.4th at p. 58 [no "significant difference between granting nonsuit and refusing, at the close of the plaintiff's case, to instruct on an issue"].) "A nonsuit is proper only if there is no substantial evidence to support a jury verdict in the plaintiff's favor. In determining whether the plaintiff's evidence is sufficient, the court may not weigh the evidence or determine the credibility of witnesses. The evidence favorable to the plaintiff must be accepted as true and any conflicting evidence disregarded. If facts sufficient to support a verdict in the plaintiff's favor may logically and reasonably be inferred from the evidence, the motion must be denied even if the evidence is also susceptible to conflicting inferences. . . . On appellate review of a grant of nonsuit, the same standard applies. 'Only if, after indulging in every legitimate inference favorable to plaintiffs, we find that there is no evidence of sufficient substantiality to support a verdict in plaintiffs' favor, can we uphold the judgment of nonsuit. [Citations.]' [Citation.]" (*Id*., at pp. 58-59.)

"On a claim for punitive damages, . . . the plaintiff's burden at trial is to establish oppression, fraud or malice by *clear and convincing evidence*. [Citation.]" (*Hoch v. Allied-Signal, Inc.*, *supra*, 24 Cal.App.4th at p. 59.) "The claim must be evaluated in that light, and on a motion for nonsuit, both the trial and appellate courts must view the evidence 'with that higher burden in mind.' [Citations.]" (*Ibid*.) Accordingly, "a nonsuit on the issue of punitive damages is proper when no reasonable jury could find the plaintiff's evidence to be clear and convincing proof of malice, fraud or oppression. On review of a nonsuit order, we apply the same standard." (*Id*., at pp. 60-61.)

21

"The key element of clear and convincing evidence is that it must establish a high probability of the existence of the disputed fact, greater than proof by a preponderance of the evidence." (*People v. Mabini* (2001) 92 Cal.App.4th 654, 662.)  For the same reasons that we determined the evidence to be sufficient to support the judgment in Company's favor on the fraud claim, we also determine that a "reasonable jury could find [Company's] evidence to be clear and convincing proof of . . . fraud . . . " (*Hoch v. Allied-Signal, Inc.*, *supra*, 24 Cal.App.4th at pp. 60-61.)  We attach significance to Hughes's statement that "he wanted to drive [Mark Melchiori] out of business."  This statement could be reasonably viewed as providing clear and convincing evidence not only of fraud but also of an alternative basis for punitive damages: malice, which "means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).)  The statement which could include the highly relevant word "wop," could well convince the jury of malice.

The refusal to instruct on punitive damages resulted in a miscarriage of justice. (Cal. Const., Art. 6, § 13.)  " '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'  [Citation.]  '[Our Supreme Court has] made clear that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility*.' [Citation.]" (*Cassim v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at p. 800.)  It is reasonably probable that the jury would have awarded punitive damages if the trial court had allowed the jury to consider the issue.

Hughes argues that Company's "failure to segregate contract and tort damages [in the special verdict form] precluded a punitive damages award" because the "Civil Code prohibits punitive damage awards for claims 'arising from contract.' (Civ. Code § 3294, subd. (a).)"  Hughes's argument erroneously assumes that the entire award of

22

$5,819,165 constituted compensatory damages for breach of contract. The jury found that Company had been injured by Hughes's fraud and clearly intended to include damages for that injury in its award. The jury answered "yes" to the following question on the special verdict form: "Was . . . Company's reliance on Donald Hughes' promise [to pay] a substantial factor in causing harm to . . . Company?" Hughes acknowledges that "[t]he . . . verdict establishes . . . that the jury found fraud and certain compensatory damage amounts under a preponderance of the evidence standard."

*The Trial Court Did Not Erroneously Deny Company's Motion to Add*
*Hughes as a Judgment Debtor on the Breach of Contract Judgment*

Pursuant to section 187, Company moved to amend the breach of contract judgment against Chapala to add Hughes personally as an additional judgment debtor. The motion was made "on the ground that Mr. Hughes is the alter ego of Chapala." The trial court denied the motion, and Company cross-appealed from the post-judgment order.

" '[S]ection 187 authorizes a trial court to amend a judgment to add judgment debtors.' [Citation.] The court may exercise its authority to impose liability upon an alter ego who had control of the litigation, and was therefore represented in it. [Citation.] Fn. omitted." (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1072.) "There are two requirements for disregarding the corporate entity: first, that there is a sufficient unity of interest and ownership between the corporation and the individual or organization controlling it that the separate personalities of the individual and the corporation no longer exist; and second, that treating the acts as those of the corporation alone will sanction a fraud, promote injustice, or cause an inequitable result. [Citation.] 'Both of these requirements must be found to exist before the corporate existence will be disregarded, and since this determination is primarily one for the trial court and is not a question of law, the conclusion of the trier of fact will not be disturbed if it is supported by substantial evidence.' [Citations.]" (***Ibid***.)

23

"The first requirement for disregarding the corporate entity under the alter ego doctrine - whether there is sufficient unity of interest and ownership that the separate personalities of the individual and the corporation no longer exist - encompasses a series of factors. Among the many factors to be considered in applying the doctrine are one individual's ownership of all stock in a corporation; use of the same office or business location; commingling of funds and other assets of the individual and the corporation; an individual holding out that he is personally liable for debts of the corporation; identical directors and officers; failure to maintain minutes or adequate corporate records; disregard of corporate formalities; absence of corporate assets and inadequate capitalization; and the use of a corporation as a mere shell, instrumentality or conduit for the business of an individual. [Citation.] . . . ' "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." ' [Citation.]" (*Misik v. D'Arco*, *supra*, 197 Cal.App.4th at p. 1073.)

In its opening brief on cross-appeal, Company does not discuss any of the factors pertinent to the unity of interest requirement. It merely points out that, during a midtrial hearing on its unsuccessful motion to amend the complaint to add an alter ego allegation, the trial court stated: "I think the unity of interest, certainly the first prong is there. Chapala One [LLC] is Mr. Hughes. But the various nefarious activities that a person would undertake to abuse the corporate structure I don't think [Company] has proven." Company argues that the trial court impliedly made the same finding on unity of interest when it denied the postjudgment section 187 motion. At the hearing on this motion, Company's counsel asked the trial court why it was denying the motion. The trial court replied: "It would be the same rationale that I gave you at the time in trial that you wanted to file the Third Amended Complaint alleging the alter ego. . . . I don't think I'm required to give you anything more today and I'm going to stand on the comments that I made at the time that we analyzed the alter ego at the trial."

24

The trial court's statements do not establish that, as to the unity of interest requirement, its denial of Company's section 187 motion is unsupported by substantial evidence. Company has not shown that Hughes was the sole owner of Chapala,[8] that Hughes and Chapala used the same office or business location, that they commingled funds, that Hughes held himself out as being personally liable for Chapala's debts, that he failed to maintain adequate records for Chapala, that he disregarded LLC formalities, or that Chapala was undercapitalized at its inception.

Company erroneously argues that, because the trial court impliedly found that the unity of interest requirement had been met, Hughes has the burden of showing that this implied finding is not supported by substantial evidence. "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citations.]" (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) We must therefore presume that the order denying Company's section 187 motion is correct. " '[A]ppellant bears the burden of overcoming the presumption of correctness.' [Citation.]" (*Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1207.) Company has failed to carry its burden on the unity of interest issue. We therefore need not consider whether it carried its burden on the other requirements for amending a judgment to add judgment debtors pursuant to section 187.

*Remand*

On the cause of action for fraud, the matter must be remanded for a new trial on the issues of compensatory and punitive damages. In the new trial proceedings, the

---

[8] Hughes testified that his aunt was a nonvoting member and that he was the sole managing member. During argument on the section 187 motion, Company's counsel stated that, contrary to Hughes's testimony, counsel's office had "determine[d] that in fact [Hughes] is not the sole managing member of Chapala One, LLC, that also members . . . are his own personal family trust and the personal family trust of Mr. Levy."

trier of fact shall be bound by the jury's special verdict findings in the original trial, with the exception of the finding on the amount of compensatory damages.

*Disposition*

The post-judgment order denying Company's section 187 motion to add Hughes personally as a judgment debtor on the breach of contract judgment against Chapala is affirmed.  The fraud judgment against Hughes is reversed only insofar as it (1) awarded compensatory damages in the amount of $5,819,165, excluding offsets for pretrial settlements; (2) refused to reduce compensatory damages by the $2.3 million pretrial lenders' settlement, (3) awarded Company its costs of suit of $94,467.39,[9] and (4) refused to allow Company's claim for punitive damages to go to the jury.  The matter is remanded for a new trial solely on the issues of compensatory and punitive damages in accordance with the views expressed in this opinion.  In all other respects the judgment is affirmed.  The parties shall pay their own costs on appeal.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P.J.


PERREN, J.

---

[9] " 'After reversal of a judgment, "the matter of trial costs [is] set at large." [Citation.]' [Citation.]"  (*Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1053.)

26

Denise de Bellefeuille, Judge

Superior Court County of Santa Barbara

_____

Griffith & Thornburgh; John R. Rydell II and Nathan C. Rogers, for Appellant and Cross-Respondent.

Mollenkopf Law Group, Kristine L. Mollenkopf;  Margulies Faith, LLP, Jeremy W. Faith, for Respondent and Cross-Appellant.